UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

DEREN SMITH                                    CIVIL ACTION

v.                                             NO. 12-2270

BASIC MARINE SERVICES, INC.                    SECTION "F"

ORDER AND REASONS

Before the Court are two motions by Basic Marine Services, Inc.: (1) motion for summary judgment dismissing the plaintiff's claims for unseaworthiness and Jones Act negligence; and (2) motion for partial summary judgment dismissing the plaintiff's claims related to punitive damages for maintenance and cure and unseaworthiness. For the reasons that follow, the motions are GRANTED.

Background

This marine personal injury case concerns alleged Jones Act negligence and unseaworthiness arising from a pipe-tripping operation on a rig.

On June 8, 2011 Basic Marine Services, Inc. hired Deren Smith as a floor hand.[1] Mr. Smith's duties included tripping pipe in and

_____

[1]Before starting work, Basic Marine requires that employees participate in a pre-employment orientation, which includes watching a video and reading a safety manual that provides that Basic Marine employees must immediately report any accident and injury. New Basic Marine employees must also participate in a mentoring program. Additionally, Basic Marine employees are vested with "Stop Work Authority", which means that if any rig employee

1

out of the hole, assisting the derrick man on the mud pits, loading and off-loading supplies in the galley, and housekeeping. After three months of working his typical shift of seven days on and seven days off, Mr. Smith also began operating the tongs. As a lead tong operator, Mr. Smith was vested with leadership responsibilities including mentoring less experienced crew members.

On February 26, 2012 Mr. Smith described the seas as light, the weather conditions as cold, and no problem with wind. Mr. Smith was wearing protective gear including his fire retardant uniform, a hard hat, and safety goggles. Rig 10 was operating with a full six-member crew, including Johnny Poarch (tool pusher); Chris Bond (driller); Earnest Norman (motorman); Shelly Davis (derrick man); Terry Crochet (floor hand); and Mr. Smith (floor hand). According to contemporaneous inspection reports, Rig 10's wiper rubber (which wipes the oil based mud off the pipe as it comes out of the hole) was working properly, as were the elevators and other rig equipment.[2]

---

sees something unsafe, the employee has the authority to stop working, without any consequences, and to stop the particular job from continuing until the safety issue is discussed and corrected. This authority is explained in the Basic Marine manuals, including the employee handbook and the Basics to Success Manual, as well as periodically discussed at safety meetings.

[2]Mr. Poarch was the tool pusher responsible for preparing weekly inspection reports on Rig 10; the February 28, 2012 Weekly Inspection Report noted that all equipment on Rig 10 was functioning properly. A morning report dated February 26, 2012 confirmed that all equipment was functioning properly.

2

On February 26, before Mr. Smith began his shift, a pre-tower safety meeting was conducted by Mr. Poarch or Mr. Bond in the galley.  At the safety meeting, the crew discussed slips, trips, and falls and how to prevent them, along with housekeeping and maintenance issues, which are also important to rig safety.

Later on February 26, Mr. Smith alleges that he was working the night tower (6 a.m. to 6 p.m.)[3] as a floor hand operating the tongs on Basic Marine Rig 10.  As Mr. Smith describes it, he was working on the rig floor "tripping pipe" out of the hole and laying the drill string on the rig floor, a task that he had performed without incident on at least five occasions.  The process of tripping pipe is typically performed with two floor hands: one to run the tongs and the other to rack back the pipe.  On that particular day, Mr. Smith was the lead tong operator on the drill floor with the other floor hand, Mr. Crochet.  Mr. Smith was tasked with breaking the connection of pipe with the tongs.  After the connection of pipe was broken, the other floor hand would push the tail end of the pipe out of the V-door.  After Mr. Smith finished breaking the connection and hung his tongs, he would then help the other floor hand pull the pipe that was still in the elevators. Mr. Smith would then unlatch the elevators to let the joint of pipe

_____

[3]Basic Marine submits that its Daily Drilling Report confirms that Mr. Smith was not working the night shift but, instead, worked the day shift 6:00 a.m. to 6:00 p.m. on February 26, 2012.

fall out of the elevators and slide down the V-door.  After the other floor hand and Mr. Smith finished pushing the pipe out of the V-door, the driller would lower the elevators so the derrick hand could then latch the next joint of pipe in the hole.[4]

Tripping pipe out of the hole is a task that can be performed by the two floor hands alone.  Nevertheless, crew members often assist one another.  On February 26, the derrick man, Mr. Davis, was on the drill floor assisting the crew members as needed.  The derrick man's only duty while on the rig floor would be to hook the elevators to the joint in the hole.  (He would not have been required to push on the elevators).  If he was working on the backside of the elevators, his job consisted of waiting for the elevators to come down to latch them to the next joint of pipe in the hole.  At some point, Mr. Davis left the rig floor to use the bathroom.[5]

Mr. Smith alleges that sometime between 11:30 p.m. and 3:00

---

[4]The record suggests that the diameter of the pipe the crew was working with on February 26 was 2 7/8 inch PH6 workstring -- the smallest diameter pipe and the easier pipe to handle in workover operations.  The weight of the joint of 2 7/8 inch tubing is approximately 360 pounds, but the weight of the pipe is being supported by elevators such that the maximum force that would be exerted by a floor hand to move the bottom of the free-hanging joint to the V-door is less than 10 pounds.

Mr. Smith submits, however, that the pipe was "bigger and heavier" than that.

[5]It is common for floor hands or the derrick man to take routine breaks while on the rig floor; operations need not be shut down during this time.

a.m. he injured his left shoulder while pushing on the elevators when the crew was tripping pipe out of the hole and laying drill string down on the rig floor.  He had performed this task of "coming out of the hole and laying down the drill string" more than five times prior to the February 26 incident.  Specifically, Mr. Smith says he injured his shoulder when he was required to extend his arms above his head and push the handles on the elevators, rather than pull on the joint of pipe, to get the joint through the V-door; Mr. Smith says he and the other floor hand had to push a little harder than normal because there was mud on the pipe and the V-door.[6]  As he was pushing on the elevators to help the other floor hand get the pipe down to the V door, Mr. Smith says he heard a popping sound in his shoulder and felt a burning sensation.

Mr. Smith continued to work the remainder of his shift;[7] the parties dispute whether Smith reported his injury.[8]  But the

---

[6]Mr. Smith admits that there is always mud on the pipe when they pull a string of pipe out of the hole; there is equipment called a wiper rubber that cleans the mud off of the pipe in sections as it comes out of the hole.
        Mr. Smith says he complained to the other floor hand but no one else regarding the pipe being difficult to get through the V door because of the build-up of mud.

[7]Mr. Smith states that he continued to work, but he only ran the tongs; he did not push or pull.  Instead, the motorman, Junior Normand, helped to get the sections of pipe through the V door for the remainder of the tower shift.

[8]Mr. Smith says that he told Mr. Bond and then, eventually, told Mr. Poarch about his injury on the day of the incident.

following undisputed facts are vital:  The Morning Report does not indicate that any crewmember was involved in an accident on February 26; the Daily Drilling Report completed by Mr. Poarch does not refer to any accident on Rig 10 on that day;  at the end of Mr. Smith's hitch on February 28th, he completed a Rig Injury and Illness Disclaimer, in which Mr. Smith (and other crew members) attested that he was not involved in an accident on that day.

Mr. Smith finished the remainder of his hitch (two more days), and returned home for his one week off.  Without notifying Basic Marine, Mr. Smith was treated by a family doctor, Dr. Scott Smith at STATCare, in McComb, Mississippi for his left shoulder on February 29, 2012.  According to the doctor, Mr. Smith did not give any information about the cause of his complaints, and did not mention that he was injured at work.  Mr. Smith did not contact Basic Marine before receiving treatment at STATCare; he did not ask Basic Marine to pay for his medical treatment there; and he never provided Basic Marine with a written report from STATCare regarding the treatment he received.

Rather, Mr. Smith returned to Rig 10 to work his next hitch. Still again, he did not ask anyone to complete an incident report. He went home after that next hitch and did not seek additional medical treatment.[9]  Thereafter, he returned for his next hitch; he

_____

[9]Mr. Poarch says that on March 25, 2012 Mr. Smith told Mr. Poarch that he had discomfort in his left shoulder; he allegedly said he might have slept wrong on his shoulder but stated

told Mr. Poarch that his shoulder was better but still bothering
him.  On April 7, 2012 Mr. Poarch completed a Basic Marine First
Report of Injury or Illness regarding Smith's left shoulder
complaint; the report does not list the immediate cause of injury
because, Mr. Poarch says, the cause was not conveyed to him.  The
next day, Mr. Smith requested medical treatment for his left
shoulder.[10]   Mr. Poarch contacted the Basic Marine Area
Superintendent, Mr. Elie Prosperie, who accompanied Smith to All
Industrial Medical Services, Inc. in Houma, Louisiana, where he was
diagnosed with a left shoulder/trapezius strain, and released to
return to regular work duties.  But Basic Marine did not require
Smith to return to regular duty employment; it assigned him to
light duty employment on Rig 15, where Smith remained from April 8
through May 7, 2012, during which time he was paid his full wages.

    While on light duty, on May 4, 2012, Mr. Smith underwent a
left shoulder MRI at Terrebonne General Hospital; the MRI was
negative for any abnormality, although it revealed evidence
indicative of arthritis (a degenerative condition).  Without
advising Basic Marine, Mr. Smith sought treatment with his
orthopedist of choice, Dr. Thomas Jeffcoat.  It is Dr. Jeffcoat's
opinion that Mr. Smith could return to work and that Mr. Smith's

---

that he did not injure himself on the rig.

    [10]Mr. Smith says that, on April 8, he was doing the same
type of work he had been doing on February 26, the regular duties
of a floor hand, and his shoulder got worse.

complaints had been ongoing and were likely caused by arthritis, not by a traumatic event.

Mr. Smith then returned to full duty employment on Rig 10 from May 8, 2012 through August 14, 2012. On August 21, 2012 Mr. Smith faxed Basic Marine a one-page work excuse, noting that he was unable to work pending surgery. The excuse was not accompanied by any medical records and did not specify what surgery was being recommended or why he was unable to work. Mr. Smith has not returned to work since August 14, 2012.

On September 13, 2012 Daren Smith sued Basic Marine Services, Inc., alleging Jones Act negligence, unseaworthiness, and seeking to recover maintenance and cure as well as for physical, mental, and emotional pain; lost wages, fringe benefits, and wage earning capacity; physical disability; medical expenses; and punitive damages. Mr. Smith alleges that Basic Marine, the owner and operator of Rig 10, negligently caused his injuries and maintained an unseaworthy vessel. In particular, Mr. Smith submits that Basic Marine failed to institute safe housekeeping practices and, as a result, oil-based mud was allowed to build up around the V-door during tripping pipe operations. This caused the task of pushing pipe to be more strenuous; that is, the plaintiff contends, he had to exert extra effort as he pushed on the overhead elevator handles, resulting in his shoulder injury. After conservative

treatment failed, Mr. Smith had arthroscopic surgery.[11]

Basic Marine now seeks summary relief in its favor.

### I.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law.  No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio., 475 U.S. 574, 586 (1986).  A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion.  See id.  Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate.  Id. at 249-50 (citations omitted).  Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In this regard, the non-moving party must do more than simply deny the allegations raised by the moving

---

[11]After investigating the plaintiff's claim, Basic Marine began paying maintenance benefits on April 25, 2013, and approved the left shoulder surgery.

party.  See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992).   Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims.   Id.   Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence.   Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987); Fed.R.Civ.P. 56(c)(2).   Finally, in evaluating the summary judgment motion, the Court must read the facts in the light most favorable to the non-moving party.   Anderson, 477 U.S. at 255.

## II.
### A.

Under the Jones Act, 46 U.S.C. § 688, a seaman's[12] employer is liable for damages if the employer's negligence caused the seaman's injury, in whole or in part.   Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 335 (5th Cir. 1997)(en banc).   To prevail in a Jones Act negligence claim,

> the plaintiff must present some evidence from which the fact finder can infer that an unsafe condition existed and that the vessel owner either knew, or in the exercise of due care should have known, of the condition.

Martinez v. Offshore Specialty Fabricators, Inc., 481 Fed.Appx. 942, 945, 947 (5th Cir. July 25, 2012) (citing Perry v. Morgan Guar. Trust Co. of N.Y., 528 F.2d 1378, 1379 (5th Cir. 1976).

A Jones Act employer has the duty to provide his seaman

---

[12] The plaintiff's seaman status is undisputed.

employees with a reasonably safe place to work, including providing reasonably suitable gear. <u>Colburn v. Bunge Towing, Inc.</u>, 883 F.2d 372, 374 (5th Cir. 1989). The duty to provide a safe place to work is broad in scope, but it is not a form of strict liability; ordinary prudence under the circumstances is the standard for the duty of care owed by an employer to a seaman. <u>Gautreaux</u>, 107 F.3d at 335-36. Likewise, seamen are held to the standard of the reasonable seaman in like circumstances. <u>Id.</u> at 339 (explaining that the circumstances include the employee's reliance on his employer to provide a safe working environment, the seaman's experience, training, or education). And the causation standard is the same for both the employer's negligence and contributory negligence: causation is established if the party's "negligence played any part, even the slightest, in producing the injury". <u>See</u> <u>Martinez</u>, 481 Fed.Appx. at 947 (quoting <u>Johnson v. Cenac Towing, Inc.</u>, 544 F.3d 296, 303 (5th Cir. 2008)). However, more than mere "but for" causation must be established. <u>Johnson v. Cenac Towing, Inc.</u>, 544 F.3d 296, 302 (5th Cir. 2008)(citation omitted).

Basic Marine contends that the plaintiff has failed to present any evidence to support a negligence claim and, in light of the following record facts, among others, summary relief is appropriate: there has been no evidence presented to indicate that there was a safer or alternative method for tripping pipe; there has been no evidence presented to indicate that the method being

used was an unsafe method (or evidence to suggest how the method on
February 26 differed from the many other times the plaintiff had
participated in the task); the plaintiff and the other crew members
were vested with stop work authority but none exercised it; the
plaintiff's own deposition testimony confirms that pushing on the
elevators is part of his job duties as floor hand and that he was
responsible for such duties regardless of whether the derrick man
was on the rig floor helping out the crew; at all significant
times, the record facts teach that plaintiff did not use official
processes to report any incident, after many opportunities to do
so.

The plaintiff seeks to give birth to fact issues to avoid
summary judgment on his Jones Act negligence claim:  the tool
pusher was rushing the crew; the pipe being used during tripping
operations was bigger and heavier than normal; there was a lot of
mud coming out of the hole, making it harder to push pipe; the
derrick man left the rig floor to go to the rest room; and the
plaintiff somehow asserts that he reported his injury as soon as it
happened (notwithstanding a clear record to the contrary) but was
told he could not fill out an accident report because there had
been too many accidents.  Whether bona fide issues or not, none of
these alleged facts are material to the issue of Basic Marine's
negligence, or the issue of causation.

First, the plaintiff contends that the tool pusher was rushing

the crew. Even taking the plaintiff's word as true, he fails to suggest how this contributed to his alleged injury, which occurred when he was pushing the elevator handles; an injury he said he again suffered performing the same task in April. He does not submit that the fact of being rushed contributed to the way he was pushing the elevators and, thus, his injury.[13]

Second, the plaintiff states that the pipe was bigger and heavier than usual. Although contradicted by other evidence in the record, this dispute does not preclude summary judgment because the plaintiff fails to show how this dispute (concerning the allegedly heavier pipe) is material. The plaintiff fails to explain to the Court, by advancing a theory supported by record evidence, how the "bigger and heavier" pipe contributed to the shoulder injury he sustained when he was pushing the elevator handles.[14] There is no record evidence suggesting that a different and safer method for tripping pipe should have been employed due to the size or weight of the pipe being tripped.

Third, the plaintiff attributes his injury to the amount of mud that he says was on the pipe and the V-door, speculating that

---

[13]Curiously, with respect to the April re-injury incident, he fails to point to any fact of record that suggests that the same rush factor was present.

[14]And, again, the plaintiff's version of the record is that he was performing the exact same task in April when he aggravated the February shoulder injury; there is no record evidence concerning the size or weight of the pipe that was being tripped in April.

the mud made the pipe harder to push.  Again, taking the plaintiff's version of the amount of mud present as true, he has failed to demonstrate (rather than speculate) how this made the task he was performing unsafe; how Basic Marine could have known about the mud build-up hindering his task or making it unduly dangerous; and, if he noticed that his work was made more difficult by this mud build-up, why he did not exercise his stop work authority.[15]  Nor does the plaintiff point to any record evidence demonstrating that any member of the crew, including himself, recognized the alleged mud build-up as hindering the task to the point of creating a hazard.  In fact, the plaintiff points to no evidence in the record suggesting that the presence and use of oil-based mud was particularly dangerous or unorthodox, or that a safer method of pushing the elevator handles while tripping pipe should have been implemented, or that he ever followed company processes and reported an incident at or near the time it is claimed to have happened.

Fourth, Mr. Smith complains that the derrick hand had left to go to the bathroom, requiring Mr. Smith to perform the derrick man's duties as well as his own.  The absence of the derrick man is not material, however, given that Mr. Smith also confirms that the derrick hand would not be charged with pushing the elevators, which

_____

[15]Mr. Smith confirmed that he knew he had stop work authority -- "the right to stop the job without any consequences...when you see something not safe."

14

was the task plaintiff was fulfilling when he claims he injured his shoulder.[16]  Moreover, the plaintiff submits no evidence that would support a finding that industry practice or safety requires more than two crew members on the rig floor while tripping pipe out of the hole.

Fifth, the plaintiff's contention that he was told, post-injury, that he could not complete an accident report because there had been too many accidents is concerning, but it is not helpful to whether or not Basic Marine's acted imprudently in causing the plaintiff to injure his shoulder.

In fact, the plaintiff presents no evidence supporting his allegation that Basic Marine violated its duty to plaintiff, or that any alleged negligence caused his shoulder injury. Significantly, "a Jones Act employer is not an insurer of a seaman's safety; the mere occurrence of an injury does not establish liability." Marvin v. Central Gulf Lines, Inc., 554 F.2d 1295, 1299 (5th Cir.), cert. denied, 434 U.S. 1035 (1978).  Mr. Smith advances no theory to suggest how his employer could have acted more prudently under the circumstances such that his shoulder injury would have been prevented; he presents no genuine issues of material fact concerning the safety of the pipe-tripping method employed by Basic Marine's crew, or other crew-based negligence

---

[16]If the derrick hand had been assisting, "he don't have to push...just the two floor hands."

15

that caused him to injure his shoulder.  Absent any evidence that the pipe-tripping method employed was itself unusual or hazardous, the plaintiff has failed to raise a material fact issue concerning whether Basic Marine acted negligently in the method it employed for tripping pipe, including the use of oil-based mud.  Cf. id. at 1297.  There is no record evidence suggesting that Basic Marine failed to provide Smith with a reasonably safe place to work.  Or that an incident happened.  Because the plaintiff cannot establish an essential element of his Jones Act negligence claim, summary judgment in Basic Marine's favor is warranted.

### B.

Independent from a claim under the Jones Act, a seaman has a claim for injuries caused by the unseaworthiness of a vessel under general maritime law.  The duty of a vessel owner to provide a seaworthy vessel is an absolute non-delegable duty; the duty imposes liability without fault.  See Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 548-49, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960).  A ship is seaworthy if the vessel, including her equipment and crew, is reasonably fit and safe for the purposes for which it was intended to be used.  Boudreaux v. United States of America, 280 F.3d 461, 468 (5th Cir. 2002)(citation omitted); Boudoin v. Lykes Bros. S.S. Co., 348 U.S. 336, 339, 75 S.Ct. 382, 99 L.Ed. 354 (1955) ("The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm but a vessel

reasonably suited for her intended service.").

Unseaworthiness is not a fault-based standard; a plaintiff must show, however, that the unseaworthy condition "played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." Phillips v. Western Co. of North America, 953 F.2d 923, 928 (5th Cir. 1992).   "[A]n isolated personal negligent act of the crew" is not enough to render a ship unseaworthy. Daughdrill v. Ocean Drilling & Exploration Co., 709 F. Supp. 710, 712 (E.D. La. 1989).   Instead, there should be evidence of "a congeries of acts." Id. (quoting Robinson v. Showa Kaiun K.K., 451 F.2d 688, 690 (5th Cir. 1971)).

"A vessel's condition of unseaworthiness might arise from any number of circumstances.   Her gear might be defective, her appurtenances in disrepair, her crew unfit.   The number of men assigned to perform a shipboard task might be insufficient.   The method of loading her cargo, or the manner of its stowage might be improper." Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 91 S.Ct. 514, 517-18, 27 L.Ed.2d 562 (1971)(internal citations omitted); see also Webb v. Dresser Indus., 536 F.2d 603, 606 (5th Cir. 1976), cert. denied 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 572 (1977).   A vessel is unseaworthy when an unsafe method of work is used to perform vessel services.   Rogers v. Eagle Offshore Drilling Serv., 764 F.2d 300, 303 (5th Cir. 1985); Burns v. Anchor-

17

<u>Wate Co.</u>, 469 F.2d 730 (5th Cir. 1972).[17]

Mr. Smith contends that Basic Marine failed to institute safe housekeeping practices, failed to perform job safety analysis related to tripping pipe, and otherwise employed an unsafe method of tripping pipe. His contentions find no support in the record. On the other hand, Basic Marine submits that the record shows that Rig 10 was reasonably fit and safe for its intended purpose, that the method of tripping pipe in effect on February 26, 2012 was a safe method, that it was accomplished using a reasonable number of crew members, and that all of the equipment needed to perform the pipe-tripping task was in safe and working order. The Court agrees. Basic Marine has carried its summary judgment burden by demonstrating that Mr. Smith cannot prove an essential element of his unseaworthiness claim (that Rig 10's appurtenances or its crew were not fit for their intended purposes such that an unseaworthy condition played a substantial part in causing Smith's injury); accordingly, summary judgment is appropriate.

The record establishes that Rig 10 was reasonably fit and safe. The record shows that the equipment used by the Rig 10 crew

---

[17]A seaman has a duty under both the Jones Act and general maritime law to act as an ordinary prudent seaman would act in the same or similar circumstances. <u>Jackson v. OMI Corp.</u>, 245 F.3d 525, 528 (5th Cir. 2001). If a seaman's negligence contributes to his injury, his "contributory negligence will not bar his recovery, but may reduce the amount of damages owed proportionate to his share of fault." <u>Jauch v. Nautical Services, Inc.</u>, 470 F.3d 207, 213 (5th Cir. 2006).

on February 26, 2012 was in working order, and that the rig was operating with a full six-member crew.[18]   There is no evidence suggesting that the number of crewmembers tripping pipe was insufficient, or that the method used by the crew was unsafe. Where, as here, the record fails to suggest that the February 26 incident, if one assumes it ever occurred, was caused by anything wrong with the crew, or that it had something to do with faulty equipment or unsafe work methods, there is simply no evidence supporting the plaintiff's theory that an unseaworthy condition played a substantial part in causing his injury.

*C.*

"Maintenance and cure is an ancient duty imposed on a shipowner to provide for a seaman who becomes ill or injured during his service to the ship." Silmon v. Can Do II, Inc., 89 F.3d 240, 242 (5th Cir. 1996).   This duty is implied in maritime employment contracts and exists regardless of whether the shipowner was at fault or the vessel unseaworthy.   O'Donnell v. Great Lakes Dredte & Dock Co., 318 U.S. 36, 41-42 (1943); Guevara v. Maritime Overseas Corp., 59 F.3d 1496, 1499 (5th Cir. 1995), *abrogated on other grounds by* Atlantic Sounding Co., Inc. v. Townsend, 129 S.Ct. 2561

---

[18]Mr. Smith himself testified that "[as] far as I know" the wiper rubber (which is a device on the rotary whose purpose is to clean the mud off the pipe sections as it comes up out of the hole) was working properly on February 26, 2012.   Mr. Poarch confirmed that the wiper rubber was working and testified that it generally "works pretty good" and cleans about 80-85% of the mud off the pipe.

(2009).  "Maintenance" is the right of a seaman to food and lodging if he becomes injured while performing his duties to the ship. Guevara, 59 F.3d at 1499.  "Cure" is the right to necessary medical services.  Id.[19]

The parties do not dispute that Basic Marine has met and continues to meet its maintenance and cure obligation.  The defendant seeks to dismiss the plaintiff's punitive damages claim (as well as his claim for compensatory damages and attorneys' fees) relative to his maintenance and cure claim, whereas the plaintiff seeks to "reserve" his claim.  The defendant also seeks to dismiss the plaintiff's punitive damages claim that plaintiff seeks to recover under general maritime law for gross negligence or unseaworthiness.  The Court finds merit in both requests.

First, the plaintiff provides no support for "reserving" his damages claim based on his speculation that the defendant might wrongfully terminate its maintenance and cure obligation. Certainly, a seaman is entitled to seek punitive damages for his employer's alleged willful and wanton disregard of its maintenance and cure obligation.  Atlantic Sounding Co., Inc. v. Townsend, 129

_____

[19] Before recovering maintenance and cure, the seaman bears the burden of establishing: (1) his engagement as a seaman; (2) his illness or injury occurred, was aggravated or manifested itself while in the ship's service; (3) the wages to which he may be entitled; and (4) the expenditures or liability incurred by him for medicine, nursing care, board and lodging.  Harrison v. Diamond Offshore Drilling, Inc., C.A. No. 07-417, 2008 WL 708076, at *14 (E.D. La. March 6, 2008)(Vance, J.)(citation omitted).

S.Ct. 2561, 2575 (2009).  The record, however, confirms that Basic Marine has honored its maintenance and cure obligation; the plaintiff is not entitled to recover for arbitrary conduct that may or may not occur in the future.

Second, the Court notes that, to the extent the plaintiff seeks to recover punitive damages under general maritime law for gross negligence or unseaworthiness, the plaintiff cannot do so: this Court has determined that the plaintiff's unseaworthiness claim is unsupported and must be summarily dismissed.  Any determination on the appropriateness of recovering punitive damages under general maritime law for gross negligence or unseaworthiness is, at best, moot; it would be simply advisory.

Accordingly, the defendant's motion for summary judgment regarding plaintiff's claims for unseaworthiness and Jones Act negligence is GRANTED, and the defendant's motion for partial summary judgment is GRANTED.  The plaintiff's claims are hereby dismissed.[20]

New Orleans, Louisiana, August 7, 2013

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

[20]Of course, the defendant must continue to pay maintenance and cure benefits until maximum medical cure is achieved.  If the defendant fails to do so, the plaintiff may seek relief from the Court.